People of State of Illinois ex rel. Ruta Smilga, Plaintiff Below. On Appeal of Alina Klabis, Petitioner Below, Appellant, v. Dr. and Mrs. Conrad Hoyer, Respondents, Appellees.

In the Matter of Petition of H. Conrad Hoyer and E. Margaret Hoyer to Adopt Ruta Smilga, a Minor, on Appeal of Alina Klabis, Appellant, v. H. Conrad Hoyer and E. Margaret Hoyer, Appellees.

Gen. Nos. 45,530, 45,531.

Opinion filed January 18, 1952. Released for publication February 5, 1952.

THEODORE L. FORSBERG, and WILHO TIKANDER, both of Chicago, for appellant.

ELMER N. HOLMGREN, and ALBERT HEALY WERNER, both of Chicago, for appellees; CHARLES D. SNEWIND, of Chicago, of counsel.

MR. PRESIDING JUSTICE TUOHY delivered the opinion of the court.

Alina Klabis appeals from an order of the county court of Cook county denying her petition to vacate a decree of adoption and from an order of the superior court of Cook county dismissing her petition for a writ of habeas corpus wherein the question of the right of custody of the same minor child was involved. The appeals have been consolidated in this court.

Respondents H. Conrad Hoyer, a Lutheran clergyman and his wife, E. Margaret Hoyer, on December 1, 1950, filed their petition in the county court of Cook county for the adoption of Ruta Smilga, a female child then of the age of nine years. The petition set forth that the child was born at Niedersachsen, Latvia, on October 18, 1941; that the Hoyers reside in Cook county, Illinois, and had custody of the child, which was obtained from the Lutheran Home Finding Society of Illinois; that the names and whereabouts of the parents, guardian or relatives of the minor are unknown and on due inquiry cannot be ascertained; that the child has remained in the home of petitioners for more than six months; that she was deserted and that pursuant to arrangements with the United States Government the United States Committee for the Care of

366

European Children, Inc., received approval to bring the child into the United States. The minor, the Lutheran Home Finding Society of Illinois, a corporation, and the unknown parents, guardian, and relatives were made parties defendants. An order of adoption was entered on January 5, 1951.

On January 10, 1951, Alina Klabis filed her petition for writ of habeas corpus in the superior court of Cook county alleging that she was a resident of Cook county and is the "godmother" of the child who is unlawfully detained by the Hoyers. The return of the respondents to the petition set forth that they had the legal custody of the child by virtue of the adoption decree aforesaid. Thereafter Alina Klabis filed an amended petition for habeas corpus alleging that the petition for adoption filed by the Hoyers was false, untrue and fraudulent, because the Hoyers knew that Alina Klabis "was the godmother, foster mother and the only person known to be the mother of the child" and that she had control and custody of the child from the time of her birth until April 22, 1949; that since no notice of adoption was given to her, the proceeding was void.

On February 1, 1951, while the habeas corpus petition was pending, Alina Klabis filed her petition in the county court of Cook county to set aside the adoption decree. This petition recites that on November 10, 1942, the minor became gravely ill and that the petitioner had the child baptized and became her godmother and the child knew no other mother from November 6, 1942 to April 22, 1949, when they became separated at the port at New York; that while in Swinemunde, Germany, an air raid took place and the petitioner shielded said minor and saved the minor's life and in so doing the petitioner was severely injured; that a similar occurrence took place in an air raid at

367

Goslar, Germany, on March 31, 1945, at which time the petitioner again saved the life of the minor; that the petitioner accompanied said minor from Germany to New York in April of 1949, at which time and place they were separated ''for reasons unknown to the petitioner''; that on September 20, 1950, the petitioner learned that the minor had been placed in the home of the Hoyers and made several attempts to interview them and advised the Hoyers that she was the minor's godmother and foster mother; that the petitioner was given no notice of the proceedings in the county court and was first advised thereof during the pendency of the habeas corpus proceedings when she read the respondents' return thereto; that the petitioner has a job and necessary housing accommodations to take care of said minor and desires to adopt her. Thereafter, on March 1, 1951, a motion to strike the petition on the grounds that the same was insufficient in law was allowed. On March 16, 1951, the petition for a writ of habeas corpus was dismissed in the superior court.

Although there are appeals from two orders, but a single issue is presented, namely, whether the adoption proceedings in the county court of Cook county were valid; if so, the order overruling and denying the petition to vacate the decree was properly entered, as was the order dismissing the petition for a writ of habeas corpus.

■ Petitioner maintains that sufficient facts were set forth in the petition to vacate the decree of adoption to establish that petitioner stood *in loco parentis* and, occupying such a relationship to the child, should have been made a party defendant to the adoption proceedings and given notice by summons as required by law. One who stands *in loco parentis* is one who takes upon himself the obligations of a parent or parents.

In *Capek v. Kropik,* 129 Ill. 509, the court said at page 515: "So it is said, 'that a person *in loco parentis,* means a person taking upon himself the duty of a father to make provision for the child.' (*Powys v. Mansfield,* 3 M. & C. 367.)" The cases dealing with this subject emphasize the fact that one standing *in loco parentis* assumes the financial burdens arising out of the relationship of parent and child. In *Strauss v. United States,* 160 F. 2d 1017 (C. C. A. 2, 1947), certiorari denied, the court said (pp. 1018, 1019):

"There are certain obligations inherent in the parental relationship to a minor child, obligations which the defendant never undertook to perform, and never showed any intention of performing. Foremost among these obligations is the responsibility for the support of the child. *Howard v. United States,* D. C. Ky., 2 F. 2d 170; *Meisner v. United States,* D. C. Mo., 295 F. 866. This responsibility was neither borne nor contemplated by the defendant. While it is undoubtedly true that she was exceedingly fond of the insured, her statement at the time she requested an increase in the allowance from the Society was evidence of the fact that she felt no real responsibility for his support. . . .

". . . However, the parent of a minor generally is responsible for the support of the child, and we believe that such responsibility is necessary to establish the relationship of one *in loco parentis.*"

In *Niewiadomski v. United States,* 159 F. 2d 683 (C. C. A. 6), where a first cousin sued on a life insurance policy issued under the National Service Life Insurance Act, the court, in defining the term *in loco parentis,* said (p. 686):

"The term 'in loco parentis,' according to its generally accepted common law meaning, refers to a person who has put himself in the situation of a lawful parent by assuming the obligations incident to the par-

369

ental relation without going through the formalities necessary to legal adoption. It embodies the two ideas of assuming the parental status and discharging the parental duties. . . . We fully recognize the kindness and generosity which, to a large degree, was extended by appellant and her husband to the insured, but as indicated above, kindness and generosity, even on the part of near relatives, are not the same as assuming the common law relationship of *in loco parentis*."

██ ██ The facts presented by this record must be evaluated in the light of these principles. The petition to vacate the decree of adoption, the allegations of which we must assume to be true, recites that petitioner was a nurse's aide at a state foundling home at Riga, Latvia, where the child was taken shortly after her birth, and as an employee of this institution "took care of the minor in question, at which time [1945] your petitioner and the minor . . . were evacuated to Gotenhaven, Germany and then to Swinemunde, Germany." It thus appears that at the beginning of the relationship between the petitioner and the minor child there was no legal obligation or assumption on the part of petitioner to support the child. Petitioner was employed at the foundling home and in observance of her duties as such employee was required to attend to this minor child. They left the home, according to the petition, as a result of an evacuation and as refugees were moved from place to place. The fact, as alleged in the petition, that in November of 1942 when the minor was gravely ill and petitioner was afraid that she would not survive petitioner "had the child baptized and . . . became her godmother," however laudable as a work of mercy, does not vest her with any legal rights to the child's custody. The term "godmother," while of deep religious significance, is not recognized by the law. The motion to strike the petition, the allegations

370

of which are not disputed, alleges that from the time of leaving the Riga State Children's Home the minor's care has continually been the financial obligation of the International Refugee Organization, the United States Military Government of Germany, the United States Committee for the care of European Children, the National Lutheran Council, and the Lutheran Home Finding Society of Illinois; that the latter organization placed the minor with the respondents for boarding purposes, having authorization from the United States Committee for the Care of European Children, a United States federal agency, to place minor children for adoption. It thus appears that at no time during the period that the minor was under the physical care of the petitioner did the petitioner actually support the child, nor was there ever, by assumption or otherwise, any legal obligation on her to do so.

It is impossible to read this record without concluding that petitioner is a courageous woman who suffered much to protect this child during seven perilous years when they were moved as refugees from one European camp to another, and who unquestionably has a deep and abiding affection for the child. Neither can the position of the adopting parents be viewed without sympathetic appreciation. They had no knowledge prior to the adoption of any claims, moral or legal, of anyone to this unfortunate child whom they were ready and able to take into their home and raise as their own flesh and blood. More important to the court than the feelings of any of the parties involved is the welfare of this child. From the day of her birth until this kindly clergyman and his wife offered to share theirs with her, this child had never known a home. She pathetically epitomizes those who probably are the greatest of all sufferers in a war-torn world—the parentless, homeless children. Now, after seven years of wandering, a beneficent providence, as though to compensate

in some degree for the vicissitudes of the past, has sent this child to foster parents well-circumstanced to rear her in a manner befitting her dignity as a human being. We have no doubt that the child would be cherished in any home the petitioner might provide, but more stability than mere love and affection is required for her proper upbringing; and there is little in the record as to petitioner's ability to provide materially for the child.

██ In any event, we have no recourse but to decide this matter upon established principles of law, and, applying such, we are unable to say that the petitioner stands within those limits which would constitute her one *in loco parentis.* Accordingly, the order entered by the county court of Cook county dismissing her petition to set aside the adoption decree and the judgment order of the superior court of Cook county dismissing the petition for a writ of habeas corpus are each affirmed.

*Orders affirmed.*

SCHWARTZ and ROBSON, JJ., concur.